Filed 5/21/24  In re J.M. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | B326138<br><br>(Los Angeles County Super. Ct. No. 22CCJP00010B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.M.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig Barnes, Judge.  Affirmed, in part, vacated in part, and remanded with directions.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

——————————————

J.M. (father) appeals from the juvenile court's custody and visitation order issued following the termination of dependency jurisdiction over his son, J.M. Father argues the juvenile court abused its discretion when it granted sole physical custody to mother and awarded father only monitored visitation. He further contends that the juvenile court's visitation order contained impermissible conditions on the family court's future modification of the order. We vacate the portion of the juvenile court's visitation order purporting to restrict the family court's modification of the order. We otherwise affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

J.M.'s family came to the attention of the Department of Children and Family Services (DCFS) in December 2021, when his maternal half sister, M.S., reported to a teacher that J.M.'s paternal grandfather had sexually abused her from kindergarten through fourth grade, with the last incident occurring around December 2020. M.S. provided detailed reports of the abuse to DCFS, law enforcement, and medical professionals. Paternal grandfather denied the allegations.[1]

---

[1] Previously, mother, M.S., J.M., and father lived with the paternal grandparents. In late 2018 or early 2019, mother and the children left and moved in with mother's family. In January

2

A year earlier, M.S. had told mother that paternal grandfather touched her over her clothes. At that time, mother confronted father and paternal grandmother. Father did not believe M.S. and asserted that maternal aunt's boyfriend was the abuser.[2]

In December 2021, when mother learned of the full extent of paternal grandfather's abuse, she was cooperative with DCFS and enrolled M.S. in therapy. Father denied M.S.'s allegations and continued to deny them throughout the pendency of the case. In late December 2021, DCFS detained J.M. from father and placed him with mother.

In the January 2022 detention report, DCFS reported that father conceded he previously used methamphetamine. He reported being " 'hooked on it for a little bit.' " Mother said father used methamphetamine for years and it was an issue in their relationship. Father denied any current use of alcohol or drugs except for marijuana. Mother admitted she occasionally uses marijuana. In December 2021, mother tested negative for drugs and alcohol.

The January 2022 detention report also indicated father was concerned about J.M. living with mother. According to father, mother's brothers were gang-affiliated. Father also reported that maternal uncle D.B., with whom mother lived, had an arrest relating to soliciting a minor on the internet. When DCFS asked D.B. whether he could move out of the maternal

---

2021, J.M. (then two years old) returned to live with father and the paternal grandparents.

[2]     DCFS later investigated this claim and concluded the maternal aunt's boyfriend had not abused M.S.

3

family home, D.B. said his only relevant parole condition was he could not be alone with the children.

***Petition, Detention, Jurisdiction, and Disposition***

In January 2022, DCFS filed a Welfare and Institutions Code section 300 petition on behalf of J.M. and M.S.[3]  The petition alleged paternal grandfather had sexually abused M.S., father had a history of substance abuse and was a current abuser of marijuana, and mother had failed to protect the children from paternal grandfather's abuse and father's substance abuse.

In April 2022, the juvenile court sustained the petition based on mother's failure to protect the children and father's history of substance abuse and current abuse of marijuana.  The court removed J.M. from father, released him to mother, and ordered monitored visitation for father.

The court further ordered family maintenance services for mother and family enhancement services for father.  In father's written case plan, his services were listed as a drug/alcohol program with aftercare, random or on-demand drug/alcohol testing, a 12-step program, sex abuse awareness counseling, and housing assistance.  Mother was required to complete sex abuse awareness counseling, attend individual counseling, enroll M.S. in therapy, and attend joint therapy sessions with M.S. if recommended by the therapist.

***Parents' Participation in Services***

Mother participated in all of her court-ordered services and ensured the children no longer had contact with maternal uncles. She completed her court-ordered sex abuse awareness counseling in October 2022.  She also regularly attended therapy.  Mother

---

[3]     All subsequent undesignated statutory references are to the Welfare and Institutions Code.

4

enrolled M.S. in therapy and attended joint counseling with her. In September 2022, mother informed DCFS that she and the children no longer lived with any maternal uncles, and DCFS visited the home to confirm.[4]

Father complied with his court-ordered drug testing. He tested positive for marijuana on numerous occasions between December 2021 and February 2023. He also completed his court-ordered six-month outpatient substance abuse program in February 2023. The letter confirming his completion stated that while father continued to use cannabis to treat his back pain, he had not tested positive for any other substance during his six-month treatment. In February 2023, father enrolled in a recovery support program. Father also completed other programs, including a parenting class and an anger and stress management class, in February 2023. There is no indication that father enrolled in sex abuse awareness counseling.

### Father's Complaints About Mother

In February 2022, mother told the social worker that another child threw a toy at J.M., cutting his cheek, so she took him to urgent care. The social worker informed father, who responded that " 'these things never happen under his care.' "

In March 2022, father told DCFS that J.M. said mother and mother's babysitter hit J.M. Father provided videos of J.M. making these accusations. The social worker visited J.M. and found no concerns as to any physical abuse.

In August 2022, when father's visitation monitor and mother exchanged custody of J.M. at a police station, J.M. told

---

[4]     DCFS further verified that mother did not live with any maternal uncles in November 2022, February 2023, and May 2023.

the police, " 'My mommy hits me.' "  At home, J.M. apologized to mother and said father "made him" make the statement to the police.

According to DCFS's January 2023 interim review report, father would "become[ ] extremely upset" when J.M. had the flu or a cold and would "blame mother [for] being negligent," despite the social workers explaining J.M. fell ill from being in contact with other children in day care.

On a single day in March 2023, father sent five videos of J.M. to a social worker.  In one video, father accused mother of not taking care of J.M. and said J.M. was never sick in his care.  Father also accused mother of being a "dead beat."  He recorded himself interviewing J.M., asking him things like, "Why are you still sick[?]"  One video depicted father interviewing J.M., and J.M. stating " '[M]y mom wasn't behaving good . . . .' "

Later in March 2023, father sent a social worker an email asserting: "[Y]ou guys are killing my son ever since you took him from my care he[ ] gotten beat[e]n and abused and has been sick even had an opened wo[und] on his cheek and now he has as[th]ma this has gone to[o] far already my son was safe with me he is also saying bad words now and behaving aggressively he never behaved like this when he was with me . . . ."

Throughout the case, father believed a DCFS social worker was connected to mother and accused the social worker of conspiring with mother against him.

In April 2023, DCFS asked father what he had learned from his enhancement services, and father replied he had learned to cope with his anger and stress and to understand J.M., among other things.  He also said he learned not to hit his son, "unlike 'his mother who has no patience.' "  He then "shifted the focus" to

6

saying "negative things about mother like [her] neglecting his son, laying a hand to his son, [and] mother having emotional and mental health problems." In addition, father still believed paternal grandfather had not abused M.S. and that it had been the maternal aunt's boyfriend.

### Final Review Hearing and Juvenile Custody Order

In May 2023, DCFS filed a status review report recommending the juvenile court terminate jurisdiction and grant mother sole physical custody. The report stated J.M. had a strong bond and relationship with both parents and was safe in mother's home. DCFS had no concerns about J.M.'s health or development in mother's care. D.B. no longer lived with mother and had no contact with J.M., and mother continued to follow court orders and comply with DCFS. Father only communicated with DCFS through text and email, and DCFS found it "difficult . . . to engage" with father. Often, father did not respond to the social worker's attempts at contact and assistance.

At the May 2023 final review hearing, father requested sole physical custody of J.M. Father's counsel argued father had made progress in substance abuse treatment, paternal grandfather had moved out of the paternal family home,[5] and father had significant concerns about mother's brothers and her treatment of J.M. DCFS responded that father had made the same allegations about mother throughout the case, it had investigated, and there were no "safety concerns" with J.M. in

---

[5] In January 2023, father submitted a handwritten letter to the court, purportedly from a landlord, which stated paternal grandfather had a six-month lease that would terminate in July 2023.

7

mother's care.  J.M.'s counsel asked the court to grant mother sole physical custody.

The court ordered joint legal custody and awarded sole physical custody to mother, with monitored visits for father.  In explaining the order, the court cited father's "attacks" on mother "throughout the case," and the court's resulting concerns about father's ability to co-parent.  Father's counsel then requested an expansion of father's visitation rights, which the court denied, reasoning father's progress with services had been "somewhat inconsistent."  Father's comments regarding mother indicated to the court that father had "more to do," and that he would need to demonstrate progress to modify the visitation order.  The court's written order provided: "Father is to demonstrate case plan compliance and progress before the visitation orders can be changed."

After reviewing the juvenile court's written orders, father's only objection was to the contents of a page titled, "Reasons for no or Supervised Visitation."  The document indicated father had not completed and not made substantial progress in his sex abuse awareness counseling, drug abuse treatment with random testing, and individual counseling.  Father argued he did not know he was required to complete sex abuse awareness counseling; his social worker had not instructed him to enroll, and he had made substantial progress in his drug abuse treatment program.  However, father's counsel acknowledged father's written case plan required a sex abuse awareness counseling.  The court denied father's request to modify the written order.

Father timely appealed.[6]

---

[6]     Mother is not a party to this appeal.

## DISCUSSION

### I. The Juvenile Court Did Not Abuse Its Discretion by Ordering Sole Custody to Mother and Monitored Visitation for Father

Father argues the juvenile court abused its discretion in awarding mother sole physical custody, and granting father only monitored visitation, because the orders were based on an inaccurate determination that father failed to make progress in his services. He also asserts that he had reason to voice his concerns about mother and the maternal uncles, and he reasonably disbelieved M.S.'s sexual abuse allegations against paternal grandfather. We find no basis for reversal.

A juvenile court has broad discretion to make custody and visitation orders tailored to the child's best interests when it terminates jurisdiction in a dependency case. (§ 362.4; *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.) In determining how parental visitation and custody should continue after dependency jurisdiction is terminated, the juvenile court must consider the best interests of the child under the totality of the circumstances. (*In re J.M.* (2023) 89 Cal.App.5th 95, 115 (*J.M.*).)

We review juvenile custody orders for abuse of discretion. (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1456 (*Cole Y.*).) Accordingly, we do not disturb the orders unless the juvenile court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*In re M.R.* (2017) 7 Cal.App.5th 886, 902.) If two or more reasonable inferences may be drawn from the facts, we will not substitute our discretion for that of the juvenile court. (*In re J.N.* (2006) 138 Cal.App.4th 450, 459.)

9

The juvenile court did not abuse its discretion here. At the time of the May 2023 status review hearing, J.M. had lived exclusively with mother for over a year. He had a strong bond with mother and DCFS had no concerns about mother's care. Mother no longer lived with her brothers, and the children had no contact with D.B. Although father argues on appeal that the custody order was inappropriate because mother failed to protect the children from sexual abuse, there was evidence that by the time the juvenile court terminated jurisdiction, mother was ensuring M.S. was in therapy, mother had completed her sex abuse awareness counseling, and mother was enrolled in individual therapy. Moreover, while mother contemporaneously confronted father and paternal grandmother when M.S. reported paternal grandfather's sexual abuse, there is no indication father took any steps to protect M.S. or J.M. when he learned of M.S.'s accusations. Unlike mother, father did not investigate the alleged abuse, and, in May 2023, he still denied M.S.'s allegations, despite evidence indicating she was credible.

Moreover, father continued to test positive for marijuana as late as February 2023, after consistently testing positive for months. And when father finished his outpatient substance abuse program, the program officer reported he continued to use marijuana. Accordingly, the juvenile court reasonably concluded father had not yet resolved or made substantial progress in addressing his marijuana abuse. In addition, father had not completed his sex abuse awareness counseling. Father asserts that DCFS never referred him to sex abuse awareness counseling; however, his written family enhancement service plan included sex abuse awareness counseling, as his counsel conceded. The juvenile court reasonably considered the parents'

10

relative progress in their services as a reason for granting mother sole custody. (See *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 710 [sole custody to parent who established more progress with services].)

Further, there was substantial evidence father was unable or unwilling to effectively share parenting responsibilities with mother. Father made numerous accusations against mother, which DCFS investigated and found unsubstantiated. Father accused mother of allowing J.M. to be beaten and abused; of neglecting J.M., thus causing frequent illness; of being a "dead beat"; and of continuing to live with her brother, who was a registered sex offender. Father also subjected J.M. to father's disputes with mother. He coached J.M. to make accusations to the police and in videos father sent to DCFS. Based on father's unfounded accusations, and his repeated actions involving J.M. in those accusations, the court was within its discretion in determining sole physical custody to mother was appropriate because father was unable to co-parent. (*In re Maya L.* (2014) 232 Cal.App.4th 81, 103, 104 [sole custody to father where mother accused father of unsubstantiated child neglect and abuse and caused child to feel " 'caught in between her parents,' " so mother could not "coparent effectively"]; *J.M., supra*, 89 Cal.App.5th at p. 115 [sole custody to mother where father blamed mother and DCFS for his relationship issues with the child].)

Considering the totality of the circumstances, the juvenile court did not abuse its discretion when it determined joint physical custody was not in J.M.'s best interests. Nor was it an abuse of discretion for the court to conclude that father's visits should be monitored. Father does not make any specific

11

argument as to why monitored visits were inappropriate, and monitoring was reasonable to minimize father's ability to continue using J.M. as a pawn in his disputes with mother.

The juvenile court did not abuse its discretion in its orders awarding sole physical custody to mother and monitored visitation to father.

## II. The Visitation Order Is Vacated to the Extent It Purports to Limit the Family Court's Modification Authority

Father also argues the juvenile court erred when it imposed conditions on the family court's future modification of the visitation order. We agree and vacate that portion of the order.

When a juvenile court terminates dependency jurisdiction, it may issue a final order determining custody of and visitation with the minor child. (§ 362.4, subd. (a); *In re Chantal S.* (1996) 13 Cal.4th 196, 203–204 (*Chantal S.*).) These custody and visitation orders are then transferred to a family court file. (§ 362.4, subd. (c).) Pursuant to section 302, subdivision (d), the juvenile court's order "shall remain in effect after that jurisdiction is terminated. The order shall not be modified in a proceeding or action described in Section 3021 of the Family Code unless the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." Therefore, "the decision to modify an exit order [is] within the province of the family court, and then only upon a finding of 'significant change of circumstances' and that the modification is in 'the best interests of the child.' " (*Cole Y.*, *supra*, 233 Cal.App.4th at p. 1456.)

12

The juvenile court may impose requirements on parents as part of a custody or visitation order, and it may issue an order "conditioning custody or visitation on a parent's participation in a counseling program." (*Chantal S.*, *supra*, 13 Cal.4th at p. 204, citing §§ 362.4, 362, subd. (c); *Cole Y.*, *supra*, 233 Cal.App.4th at p. 1456 ["juvenile courts may require participation in counseling and other programs in an exit order"].) However, a juvenile court may not impose conditions on the family court's modification of the order because doing so would exceed its authority. (*Cole Y.*, at p. 1456 & fn. 4.) Thus, in *Cole Y.*, the court held that the juvenile court "did not have authority to condition the family court's modification of the exit order upon Father's completion of drug and parenting programs and counseling." (*Id.* at p. 1456.)

The order in this case is similar to the one at issue in *Cole Y.* Rather than simply ordering father to complete certain programs (see, e.g., *In re D.B.* (2020) 48 Cal.App.5th 613), the order expressly purported to limit future modification, stating, "Father is to demonstrate case plan compliance and progress *before the visitation orders can be changed*." (Italics added.) This is akin to the impermissible restriction in *Cole Y.* that conditioned modification of the order on father's completion of programs. (*Cole Y.*, *supra*, 233 Cal.App.4th at p. 1456.) While the juvenile court was entitled to order father to demonstrate case plan compliance and progress, it could not impose conditions on the family court's future modification of the custody and visitation order.[7]

---

[7] DCFS asserts father forfeited his argument that the custody and visitation order impermissibly restricted the family court by failing to object on that basis in the juvenile court. We

13

## DISPOSITION

The portion of the juvenile court's May 8, 2023, order limiting future modification is vacated. The matter is remanded with directions to strike the language: "Father is to demonstrate case plan compliance and progress before the visitation orders can be changed." In all other respects, the order is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.

---

note the court in *Cole Y.* addressed and rejected this same argument, reasoning: "Father's failure to object below . . . does not disable us from addressing whether the juvenile court erred in imposing conditions to the exercise of a family court's modification of an exit order absent the statutorily required finding. The issue goes to the allocation of jurisdiction between the dependency and family courts, a legal issue that, contrary to DCFS's assertion, cannot be forfeited." (*Cole Y.*, *supra*, 233 Cal.App.4th at p. 1456, fn 4.) Irrespective of whether the issue is a jurisdictional one that *cannot* be forfeited, we agree that the question is a legal one, and that we have the discretion to consider it on appeal, even if not raised below. We do so here.

14